TAYLOR ET UX. *v.* WELLER, EXECUTOR

[No. 204, October Term, 1956.]

*Decided June 7, 1957.*

The cause was argued before COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ., and KINTNER, J., Associate Judge of the Second Judicial Circuit, specially assigned.

*Donald C. Sponseller,* with whom was *Stanford Hoff* on the brief, for appellants.

*Theodore F. Brown,* with whom were *A. Earl Shipley* and *E. O. Weant, Jr.,* on the brief, for appellee.

KINTNER, J., by special assignment, delivered the opinion of the Court.

The bill of complaint in this case was filed on August 26, 1955, by Cecilia J. Fowler, a spinster, aged eighty-two years, against the appellants. The prayers of the bill were to de-

clare void certain deeds and for the sale of the property therein described. On September 27, 1955, Miss Fowler died and the appellee, her executor, was substituted as plaintiff. The case was tried in the Circuit Court for Carroll County on June 8, 1956, and the Chancellor passed a decree declaring the property to be held in trust by the appellants for the appellee, ordering it to be sold and directing the proceeds of sale to be held subject to further order. This appeal is from that decree.

The property, a small dwelling in Westminster, had been acquired by Miss Fowler in 1917 and she resided there alone for the next thirty-six years until she was eighty years old. The record does not show what her source of income was, but it appears that at her death she had no more than fifty dollars.

In 1953, at her request, her nephew, Joseph H. D. Taylor, one of the appellants, then a single man, came from his home in Pennsylvania to live with her. The record is wholly barren of information as to the prior associations between aunt and nephew. The latter was not called as a witness in the case. Much that might otherwise have been informative has been excluded by the Evidence Act.

On November 14, 1953, Miss Fowler conveyed the property to Taylor, reserving to herself a life estate. She was then in good health, mentally and physically, despite her eighty years. The dwelling was in need of repairs and it had no conveniences. In March, 1954, and in August, 1954, nephew and aunt borrowed $2,700 from a bank on mortgages. This was used to repair and improve the property.

Sometime between August, 1954, and January, 1955, Taylor married and his wife came to live there. The wife was employed in a shoe factory but the amount of her earnings is not shown. Shortly before the marriage she had received $1,600 in a settlement with her former husband and it is claimed part of this also went into the improvement of the property. The record shows nothing as to Taylor's employment or earnings.

On January 29, 1955, Taylor, his wife and Miss Fowler conveyed the property to a straw party who reconveyed it to

Taylor and wife as tenants by the entireties. At the same time an agreement under seal between Taylor and wife and Miss Fowler was executed. It was drafted by a lawyer as indicated by its form. It recites the execution of the deed, it states that the Taylors have made extensive improvements to the dwelling and expended large sums of money for that purpose and concludes with the following: "NOW THERE-FORE THIS AGREEMENT WITNESSETH that in consideration of the sum of One Dollar ($1.00) and in further consideration that the said Cecilia Josephine Fowler shall have the right and privilege to reside in said dwelling house for and during the term of her natural life, and in further consideration that in the meantime the said Joseph H. D. Taylor and Beatrice Marie Taylor, his wife, or the survivor of them, shall furnish her with reasonable and necessary food, clothing, and medical attention, and at her death be responsible for her reasonable funeral expenses, the said Cecilia Josephine Fowler does hereby simultaneously with the execution of this agreement grant and convey said property so that the said Joseph H. D. Taylor and Beatrice Marie Taylor shall hold and possess the same free and clear of her life estate therein."

The property was valued at $5,000 at the death of Miss Fowler. The Taylors had paid $579.73 on the mortgage debt of $2,700. They have paid the funeral expenses of $440. If, as they contend, Mrs. Taylor put an additional $1,500 in the improvements, the equity of Miss Fowler in the property at the time of her death would have been but $360.

In July, 1955, Mr. and Mrs. Taylor became ill and both were taken to hospitals. Apparently neither had any money at that time as they were certified for such treatment by the Carroll County Welfare Board. Mr. Taylor was sent to Sinai Hospital and Mrs. Taylor to Johns Hopkins. She underwent two major operations. On August 2, 1955, they returned. The Welfare case-worker found that the Taylors would be unable to work for six weeks and that Miss Fowler would be without means of support. On August 5, 1955, all three made application for public assistance. On August 19, 1955, Mrs. Taylor reported to the case-worker that Miss

Fowler was ready to go to a nursing home to be provided by the Welfare Board. Some delay occurred because such home was not immediately available. On August 22, 1955, Miss Fowler was taken by Mrs. Taylor to the home of Miss Anna R. Myers, who was a niece of Miss Fowler and who also resided in Westminster. She remained there until her death thirty-six days later. Four days after Miss Fowler went to the home of her niece, Miss Myers, the bill of complaint was filed. It is impossible to escape the conclusion that Miss Myers instigated this suit.

Another witness for the appellee was Mrs. Rosalie Manger. She also was a niece of Miss Fowler and lived next door to Miss Myers. These two nieces seemed quite hostile to Mr. and Mrs. Taylor. The substance of their testimony was that Mr. Taylor was an alcoholic; that when drinking he was quarrelsome; that there were constant arguments between Miss Fowler and the Taylors; that once Mr. Taylor drove his aunt out of the house and that on this last occasion he drove both his wife and his aunt out.

Miss Ruth Shoemaker, a case-worker for the Welfare Board, was called as witness by the appellee. She testified that the Taylors were eligible for hospital care and public assistance because unable, temporarily, to work. She said they had several calls from persons in the community that Miss Fowler was in need. She did not give the dates of these calls, but it may well have been while Mr. and Mrs. Taylor were in the hospital. There is no evidence that anyone stayed with Miss Fowler during that time. She testified that the Board paid $69.50 for support of Miss Fowler. She further testified that the home was comfortable as far as she could see; that Miss Fowler did not say she was dissatisfied; that she seemed sick, was lying down and sat up with difficulty.

The facts are stated in some detail because the decision in each case of this kind rests mainly on the facts. Here the evidence is clear that Miss Fowler was competent to contract at the time of the execution of the deeds and contract; that the agreement was fair and equitable when entered upon; that no fraud or deception was practiced upon her and that the ap-

pellants carried out their part of the contract down to the time of their illness and hospitalization.

The temporary impossibility of the Taylors to continue to board and care for Miss Fowler is not a legal ground to cancel the contract and require a reconveyance of the property. In *Williston on Contracts,* Rev. Ed., Vol. 6, Sec. 1957, it is said: "Not infrequently there may be excusable impossibility of immediate performance at the time when performance is due, but performance may become possible later. Such temporary excusable impossibility will obviously justify at least temporary nonperformance by the promisor unless the promisor has assumed the risk." Though impossibility as a defense was flatly denied under the early English cases, yet even there a promise of personal service was held excused by unavoidable illness. *Williston on Contracts,* Sec. 1931, Note 4.

Here the death of Miss Fowler during the time the Taylors were incapacitated ended further performance. Of course the Taylors ought to be required to repay the Welfare Board for the money paid for care from August 22 to September 27, 1955. This case has some of the features of *Nowell v. Larrimore,* 205 Md. 613, where a deed from a father to his son and wife was upheld, though the father in his last days had to be moved to a nursing home for medical care. It was held that an agreement to furnish care and support does not include medical care. However in the present case medical care is expressly covered by the contract. But no expense was here incurred for medical care.

The Chancellor relied on the case of *Vocci v. Ambrosetti,* 201 Md. 475, 488, where a deed from a father to his daughter was set aside at the suit of the father. Perhaps the following quotation from the opinion sums up the compelling reason for the decision: "As a practical matter, the decree has the supreme merit of preserving the property as a protection to the appellee against the time when none of his children may be able or willing to maintain him; and the decree achieves this without ignoring appellants' equities."

The instant case differs on the facts. We hold on the facts that the contract was fair and equitable when made; we need not decide whether a confidential relationship existed between

aunt and nephew, casting the burden of proof upon him, for if so, we think that burden has been met. We further hold that the failure of the appellants to care for Miss Fowler during the last thirty-six days of her life was excusable and not a ground to cancel the contract and set aside the deeds. We hold that the appellants should be required to repay the Carroll County Welfare Board the $69.50 advanced for care of Miss Fowler, and, in view of all the circumstances, that the costs of the case should be paid by the appellants.

> *Decree reversed and case remanded for the passage of a decree in conformity with this opinion; costs to be paid by appellants.*